UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.*,<br>KAREN J. HOBBS,<br><br>Plaintiff,<br><br>v.<br><br>MEDQUEST ASSOCIATES, INC.,<br>BIOIMAGING AT CHARLOTTE, INC.,<br>BIOIMAGING OF COOL SPRINGS, INC.<br>BIOIMAGING OF HARDING, INC. (now<br>known as BIOIMAGING OF EDMONSON),<br><br>Defendants. | Civil Action No. 3-06-1169<br>Judge Haynes |

## RELATOR'S FIRST AMENDMENT TO HER COMPLAINT BY RESTATEMENT

**COMES NOW, UNITED STATES OF AMERICA** *ex. rel.*, **KAREN J. HOBBS** by and through her counsel of record, WILBANKS & BRIDGES LLP and Aubrey T. Givens, Esq. and files this Restatement which amends her initial complaint. This Restatement is intended to (1) correct a misnomer pursuant to F.R.C.P. 15(c)(1)(C) Defendant "MedQuest, Inc." should be "MedQuest Associates, Inc."; (2) delete Defendant MedQuest, L.L.C. and the State of Tennessee as parties; (3) make changes reflecting the addition of certain additional defendants (who are affiliated corporations of MedQuest Associates, Inc.); and (4) delete certain counts and causes of action against MedQuest Associates, Inc. at this time.

By way of Restatement, Relator states that this is an action brought on behalf of the United States of America by **KAREN J. HOBBS** ("Relator") against defendants named above and their affiliated entities, (hereinafter sometimes collectively referred to as "Defendants") pursuant to the *qui tam* provisions of the Civil False Claims Act, 31 U.S.C. §§ 3729-33 ("FCA").

## SUMMARY OF ALLEGATIONS

This *qui tam* lawsuit asserts that Defendants violated the False Claims Act ("FCA") and obtained unlawful reimbursements from Medicare by failing to comply with physician supervision requirements and Medicare rules and regulations at Defendants' imaging centers in Nashville, Tennessee. The Government has intervened on specific violations of the FCA as set forth in its Complaint in Intervention. In light of the Government's intervention, Relator will continue to participate as a party in those causes of action set forth in the Government's complaint and Relator will continue to pursue her recovery under 31 U.S.C. § 3730(h) as well. The allegations and prayers for relief contained in the Government's Complaint in Intervention which are applicable to Relator are expressly incorporated and adopted within this Amendment.

## JURISDICTION AND VENUE

**1.**

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. §§ 3732(a) and 3730(b). This Court has jurisdiction to entertain a *qui tam* action. Relator is an "original source" and brings this action in the name of the United States as contemplated by the FCA, 31 U.S.C. §§ 3729-33.

**2.**

Venue is appropriate as to each defendant, in that one or more of Defendants can be found in, reside in, and/or transact business in this judicial district. Additionally, acts proscribed by 31 U.S.C. § 3729 have been committed by one or more of the Defendants in this judicial district. Therefore, within the meaning of 28 U.S.C. § 1391(c) and 31 U.S.C. § 3732(a), venue is proper.

**3.**

Relator was employed by Defendant MedQuest Associates, Inc., which is a Tennessee domestic limited liability company.

**4.**

Relator made the appropriate voluntary disclosures to the United States Government prior to the filing of this lawsuit with the United States Government as required by 31 U.S.C. Sec. 3730(b)(2).

## THE PARTIES

**5.**

Plaintiff/Relator is a resident of the State of Tennessee who brings this *qui tam* action based upon direct and unique information obtained during Relator's employment with Defendant from December 2002 until October 2004. Relator had job responsibilities for the facilities owned and operated by Defendants referenced below. She personally observed fraudulent acts being committed by Defendants on a regular basis and she was ultimately fired for protesting the illegal actions of the Defendants.

**6.**

Defendant MedQuest Associates, Inc. is a South Carolina corporation, acting through its subsidiaries, including defendants BioImaging at Charlotte, Inc., BioImaging at Harding, Inc., (now BioImaging at Edmonson), and BioImaging at Cool Springs, Inc. Defendant MedQuest Associates, Inc. operates outpatient diagnostic imaging centers in 13 states, including Tennessee.

**7.**

Defendant BioImaging at Charlotte, Inc. is a Tennessee for profit corporation, being an

3

affiliated corporation of the other defendants, whose principal location is at 1800 Charlotte Avenue, Nashville, Davidson County, Tennessee 37203. The registered agent for BioImaging at Charlotte is Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203.

**8.**

Defendant BioImaging at Cool Springs, Inc. is a Tennessee for profit corporation, being an affiliated corporation of the other defendants, whose principal location is at 3310 Aspen Grove Drive, Franklin, Tennessee 37064. The registered agent for BioImaging at Cool Springs is Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203.

**9.**

Defendant BioImaging at Harding, Inc. was a Tennessee for-profit corporation, being an affiliated corporation of the other defendants, whose principal location was at 11 Harding Mall Drive, Nashville, Davidson County, Tennessee 37211. BioImaging at Harding is now operating as BioImaging at Edmonson, and is located at 4928 Edmondson Pike, Suite 204, Nashville, Tennessee 37211. The registered agent for BioImaging at Edmonson, formerly known as BioImaging at Harding, is Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203.

## STATUTORY BACKGROUND

**10.**

The Medicare Program (hereinafter "Medicare") is a Health Insurance Program administered by the Government of the United States that is funded by taxpayer revenue. It is overseen by the United States Health and Human Services Department. Medicare was designed to assist participating states in providing medical services and durable medical equipment to persons over sixty-five (65) years of age and others that qualify for Medicare.

4

**11.**

Medicare will sometimes be referred to herein as the "Government" or "Government Payor". Defendants will sometimes be referred to collectively as "MedQuest".

**12.**

The False Claims Act ("FCA"), Title 31 USCA Section 3729 provides as follows:

*IN GENERAL- Subject to paragraph (2), any person who—*

> *(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;*
>
> *(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;*

……..[omitted paragraphs]

> *is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.*
>
> *(b) Definitions- For purposes of this section—*
> *(1) the terms `knowing' and `knowingly'—*
> *(A) mean that a person, with respect to information--*
> *(i) has actual knowledge of the information;*
> *(ii) acts in deliberate ignorance of the truth or falsity of the information; or*
> *(iii) acts in reckless disregard of the truth or falsity of the information; and*
> *(B) require no proof of specific intent to defraud;*
> *(2) the term `claim'--*
> *(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—*
> *(i) is presented to an officer, employee, or agent of the United States; or*
> *(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or*

5

> > > *to advance a Government program or interest, and if the United States Government—*
> > (I) *provides or has provided any portion of the money or property requested or demanded; or*
> > (II) *will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and*
> (B) *does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property;*
> (3) *the term `obligation' means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and*
> (4) *the term `material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.';*

**13.**

The fraudulent billing practices and actions of the Defendants described hereafter relate to acts of Defendants which caused the submission to the Government of false and fraudulent claims by physicians, clinics and medical providers for otherwise non-reimbursable technical and professional fees relating to radiological image services.

**14.**

The purpose of the fraudulent schemes described in the following paragraphs hereafter was to improperly obtain reimbursement from the Government and other private insurers. Because of the actions of the Defendants, MedQuest has submitted fraudulent claims for reimbursement through the unlawful and fraudulent conduct hereafter described in express violation of the federal statutes and Medicare regulations cited herein.

## SUMMARY OF THE LEGAL REQUIREMENTS
## WHICH APPLY TO THE CONDUCT OF DEFENDANTS

**15.**

The Medicare program mandates that a physician be personally present during medical procedures involving any invasive procedure, to include the injection of contrast material as part of a diagnostic imaging examination. Additionally, in an Independent Diagnostic Testing Facility ("IDTF"), the supervising physician present must be proficient in the performance and interpretation of the specific tests being performed. In many situations where an injectable "contrast" is needed a radiologist is required to perform the procedure and/or be present. If direct or personal supervision is required for the particular procedure being performed, the supervising physician must personally perform the service. As will appear hereafter, Defendants violated each of these requirements.

## SUMMARY OF FACTS AS TO DEFENDANTS' VIOLATION
## OF PHYSICIAN SUPERVISION REQUIREMENTS

**16.**

Relator incorporates and adopts by reference the allegations of the Government's Complaint in Intervention set out in Paragraphs 1 – 15 as if fully set forth herein.

**17.**

In support of the allegations incorporated in the preceding paragraph, Relator further states that MedQuest provides computerized tomography (CT), magnetic resonance imaging (MRI), ultrasound imaging and other imaging services at each of its three locations in Nashville, Tennessee.

**18.**

The MedQuest imaging centers are located on Harding Road, Cool Springs and Charlotte Avenue, Nashville, Tennessee. These imaging centers are owned and operated by Defendant

7

MedQuest Associates, Inc. and its subsidiaries, BioImaging at Charlotte, Inc., BioImaging at Harding, Inc., (now BioImaging at Edmonson), and BioImaging at Cool Springs, Inc., MedQuest Associates, Inc. has approximately 91 centers across the United States.

### 19.

The imaging centers located on Harding Road and Cool Springs are licensed Independent diagnostic Testing Facilities (IDTFs). Defendants unlawfully operated and billed the Charlotte Avenue location as a "physician's office practice" until July 2005, after which it purported to operate as a licensed "IDTF".

### 20.

Relator was hired on December 30, 2002 by MedQuest Associates, Inc.

### 21.

During her initial interview, she was told by Jim Roberts (Regional Manager of MedQuest Associates, Inc.) that two main problems existed which should be corrected: first of all, injections of contrast were being performed with no supervising physician on site. Additionally, technicians were giving out medicines without a physician or physician order and performing diagnostic tests without a written physicians order. The existence of a written order is essential to the establishment of medical necessity for any procedure which is billed to the Government. Early on in her tenure, the illegal dispensing of medicines without a physician's order was stopped. Unfortunately, the other problems referenced herein continued to occur on a daily basis.

### 22.

During various periods of her employment, MedQuest had no physician, or only one (1) physician who could not possibly cover the injections with contrast happening at three (3) different

8

places. At other times, multiple doctors were employed, but they were not radiologists or properly credentialed physicians who could legally cover the injections for Medicare patients. The following examples are illustrative of these deficiencies.

**23.**

Prior to hiring Relator, the MedQuest manager for all three locations, Yvonee McHorny, was terminated in November 2002. During the previous month of October 2002, the full-time radiologist was terminated. The fired radiologist was Dr. Robert Cooney. He stayed at the Harding Road facility to read imaging studies. Films from the other locations were brought to him at the Harding Road facility. He read all of the films from all three MedQuest locations during his tenure at MedQuest. Dr. Cooney had worked at that location for six or seven years prior to his termination.

**24.**

The Charlotte Avenue building was owned by Dr. William Witt. Dr Witt was the full-time chief radiologist at the local VA Hospital. Dr. Witt also read for MedQuest Associates, Inc. after Dr. Cooney left. Witt was reading all of MedQuest' films from each of the three locations from September 2002 through July 2003. Couriers would transport the films to him at his office at the Veterans Administration Hospital. In the evening, the films were taken to his home. He was not on-site at the IDTF(s) while procedures at issue were being performed.

**25.**

As stated above, Dr. Witt owned Charlotte Avenue and at some point in the late 1990's he started leasing the building to MedQuest. Because of Dr. Witt's ownership interest, Relator was told that Charlotte Avenue location was not considered by MedQuest to be an IDTF. This representation by MedQuest is contrary to the facts and law. The Charlotte Avenue imaging center was required to

9

register with Medicare as an IDTF and unlawfully failed to do so. In reality, Charlotte Avenue was operated in the same way as the Harding Road and Cool Springs facilities were operated. However, Charlotte Avenue did not have a valid license to operate as an IDTF.

**26.**

In January, 2003, Mark Just became Center Manager with direct management responsibility over the three (3) MedQuest facilities. Mr. Just is a registered nurse (RN) with a master's degree.

**27.**

After Relator started working there, she arranged for a pediatrician that could cover on occasion at the Charlotte Avenue location. The pediatrician could not read MRIs with contrast for Medicare patients because of Medicare regulations which prohibited her from doing so.

**28.**

In January or February of 2003, Dr. Witt took some vacation time from his regular duties at the VA and he was somewhat more available to read on site for MedQuest.

**29.**

Because of a shortage of physicians, MRI injections with contrast were difficult to schedule so that a physician could be physically present. They tried to schedule contrast exams around Dr. Witt's availability after July 3, 2003 when he left the VA.

**30.**

Relator and the other MedQuest employees were pressured to support the corporate initiatives which were designed to generate revenue. MedQuest placed pressure on its employees to accommodate patients referred by doctors who were targeted and solicited for referrals by MedQuest. MedQuest wanted these patients to receive prompt treatment when they arrived, even if no physician

10

was present to supervise the procedure and/or deficiencies existed with regard to written orders for these patients. In essence, MedQuest did not want patients "turned away" even if Medicare requirements would mandate otherwise. Accordingly, Relator and Mark Just, Center Manager, were forced to cover injections although no physicians were present. Specifically, Relator and Mr. Just would "witness" the MedQuest employees actually perform the injections of contrast into the spine of patients with no physician present at all.

**31.**

As stated above, it was impossible for Dr. Witt to be in two or more places at one time and there was no way he could cover simultaneously injections at the three MedQuest locations in the Nashville, Tennessee area. Similarly, Dr. Witt could not cover the injections done after 5 P.M. when he left daily. The imaging centers stayed open until 8 or 9 P.M.

**32.**

Relator called Mona Majors who was a MedQuest corporate compliance person and asked questions about the absence of a physician when contrast injections were occurring. Mona Majors immediately went to CEO Dan Schaffer and Ken Luke. By the end of the day, the CEO called Jim Roberts to find out what was going on and to find out exactly who the Relator was. Relator had only been employed for a month or two at that time. Relator was then told by Jim Roberts not to call the corporate offices of MedQuest with any more questions.

**33.**

Jim Roberts said MedQuest's corporate headquarters acted like they were "surprised" about the lack of physician coverage, but that he personally knew that they were already aware of it. MedQuest was factually fully aware of the physician supervision deficiencies prior to the time that

11

Relator articulated her complaints about this problem. MedQuest chose to ignore the situation and the questions and concerns articulated by Relator regarding the legality of this practice.

**34.**

Dr. Jean Tan was an internist who began to do some coverage at the Cool Springs location. She was not a licensed or accredited radiologist. She was not certified to read Medicare patients.

**35.**

During this time period, Mark Just learned that the coverage for Medicare patients had to be done by a <u>radiologist</u> if reimbursement is being sought from the Government.

**36.**

In August of 2003 Dr. Witt was hurt. He did not work for 4 to 6 weeks. A temporary radiologist came to read. She stayed at the Harding location about 90% to 95% of the time.

**37.**

At the end of September 2003, Dr. Witt started reading films part-time from his home using a "tele-rad" system. He was not on-site so he could not personally perform or supervise injections during this period.

**38.**

In December or January, 2004, Mark Just obtained the services of a psychologist to cover injections at Cool Springs. The psychologist could not legally cover Medicare patients. Mark Just also recruited a general physician who was not a radiologist to help with Harding center. He did this because there were days when Dr. Witt did all of the readings from his home and there was no radiologist on site. Dr. Witt came back near the end of 2003 and the start of 2004 full-time. Dr. Witt primarily operated out of the Cool Springs facility because it was near his residence.

12

**39.**

In April, 2004 Mark Just was fired.

**40.**

Relator caused a lot of controversy because she wanted guidelines for scheduling procedures involving contrast. Technicians were doing injections and Relator became increasingly concerned about the legality of this practice and the inherent patient safety issues.

**41.**

In September, 2004, Jim Roberts and Relator exchanged heated e-mails over a procedure that Relator refused to do. Shortly thereafter, Relator's employment was terminated in October 2004.

**42.**

The lack of physician presence during procedures was well known to the MedQuest's employees. Relator talked about this issue with a MedQuest marketer (Ruth Giorgio), business office manager (Sara Dunphy) and with Dr. Witt. Relator also called the corporate offices as described above. MedQuest management was present in meetings where physician supervision deficiencies were discussed. MedQuest had actual knowledge of the deficiencies set forth herein.

**43.**

On October 16, 2004, the physician who was covering at the Charlotte Avenue location was called four times by her a MedQuest technologist. The physician sounded like he was intoxicated. He was expected to cover the Cool Springs location later in the day. In light of those circumstances, the technologist injected the first patient without a physician being present. Dr. Tan was called from Cool Springs for a second patient injection. Relator personally covered the third and fourth

13

injections that day without any personal supervision from a physician. When the physician finally showed up at Cool Springs, he was still in a disoriented state.

**44.**

Relator had suggested that a log be kept of all injections performed and the names of any physicians present for those injections. Medicare requires documentation evidencing the required level of supervision of procedures. Relator was told that this was not possible. In reality, it was "not possible" because MedQuest knew that such a procedure would reveal the absence of the required physician during the procedure. Later on, a log was started at each location, but it was not maintained in an accurate fashion. The log was used primarily for tracking payments owed to physicians for covering injections. Dr Witt's whereabouts can not be tracked by reviewing the logs.

**45.**

When Relator left, the Charlotte location was doing 19 or 20 MRI procedures per day; the Harding location was doing 13 to 15 per day and Cool Springs location was doing 15 to 17 per day.

**46.**

At a meeting on September 16, 2004 with Sara Dunphy, Center Manager (Harding and Charlotte locations) and Ruth Giorgio, Center Manager (Cool Springs location), Relator documented her concerns with regard to contrast coverage. Almost all of the technologists were still regularly performing injections with no physicians present. At other times, they would not know until the last minute if a doctor was even going to show up prior to an injection.

**47.**

On October 25, 2004, (the day before Relator was terminated) Relator was told that there was a policy written put into place prohibiting the technicians from doing contrast injections without a physician on site. Relator believed at the time of the filing of her original Complaint that the technicians still to this date had not seen this written policy but may have heard about it.

## PROHIBITED RETALIATORY CONDUCT BY DEFENDANT MEDQUEST ASSOCIATES, INC. PURSUANT TO 31 U.S.C. 3730(h)

**48.**

As stated above, Relator was hired to be a Chief Technologist for Defendant MedQuest Associates, Inc. in December 2002. She was terminated in October 2004 because of her complaints regarding the illegal activities set forth in paragraphs 16 – 47 above.

**49.**

The FCA prohibits an employer from discharging or otherwise discriminating against an employee in the terms or conditions of employment because of lawful acts done by the employee in furtherance of an investigation or action under the FCA. A violation by the employer shall entitle the employee to all relief necessary to make the employee whole.

**50.**

Relator engaged in lawful conduct in furtherance of an action under the FCA and was discharged or otherwise discriminated against in the terms and conditions of employment by Defendant employer and affiliated companies and the employer's discriminatory actions were motivated by the conduct of Relator in seeking to obtain compliance by Employer Defendant MedQuest with Medicare rules and regulations as well as the requirements of the FCA.

15

**51.**

Shortly after her hiring, Relator complained to employees, physicians and staff of Defendant MedQuest about a number of the illegal practices that were occurring at the imaging centers of MedQuest, to include violations of Medicare criteria for physician supervision and physician order requirements.

**52.**

Despite Relator's attempts to convince Defendant MedQuest to change the illegal practices, it refused to come into compliance with applicable Medicare rules and regulations.

**53.**

Defendant MedQuest retaliated against Relator for her repeated efforts to stop violations of the FCA as described above. Additionally, Relator was verbally abused by Defendants' management and staff for her compliance efforts.

**54.**

Because Relator refused to condone illegal practices set forth herein and within the Government's Complaint which violate the FCA, she was subjected to the above various forms of retaliation described above.

**55.**

The retaliatory actions of Defendant MedQuest Associates entitle Relator to recover damages, fees and expenses as authorized pursuant to 31 U.S.C. §3730(h).

WHEREFORE, Relator prays for judgment against Defendants as follows:

(a) That Plaintiff recover damages against Defendants and her costs and attorney fees as authorized under 31 U.S.C. § 3730(d) for each and every appropriate cause of action set forth within

the Government's Complaint in Intervention, including, but not limited to, MedQuest's violations of 31 U.S.C. § 3729(a)(1)(A);

(b) That Relator recover her damages, as provided by law, against Defendant MedQuest Associates, Inc. for its retaliatory misconduct as authorized under 31 U.S.C. § 3730(h);

(b) That the United States and Relator be granted such other and further relief as the Court deems just and proper.

Respectfully submitted this 18th day of June 2009.

                                            s/ AUBREY T. GIVENS
                                     AUBREY T. GIVENS, Esq.
                                     Tennessee Bar No. 021491

208 Third Avenue North
Suite 300
Nashville, Tennessee 37201
Tel: 615-256-5559

                                   WILBANKS & BRIDGES, LLP

                                   By       s/ MARLAN B. WILBANKS
                                          MARLAN B. WILBANKS
                                          Georgia Bar No. 758223

                                   By:      s/ TYRONE M. BRIDGES
                                          TYRONE M. BRIDGES
                                          Georgia Bar No. 081500

3414 Peachtree Road, NE
Suite 1075
Atlanta, Georgia 30326
(404) 842-1075

                                   Attorneys for Karen Hobbs, Relator

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.*, ) | |
| KAREN J. HOBBS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| ) | Civil Action No. 3-06-1169 |
| ) | |
| MEDQUEST ASSOCIATES, INC., ) | |
| BIOIMAGING AT CHARLOTTE, INC., ) | JUDGE HAYNES |
| BIOIMAGING OF COOL SPRINGS, INC. ) | |
| BIOIMAGING OF HARDING, INC. (now ) | |
| known as BIOIMAGING OF EDMONSON), ) | |
| ) | |
| Defendants. ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on June 18, 2009, a copy of the foregoing **RELATOR'S FIRST AMENDMENT TO HER COMPLAINT BY RESTATEMENT** with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

>Rebekah N. Plowman, Esq.
>EPSTEIN BECKER & GREEN P.C.
>945 East Paces Ferry Road, Suite 2700
>Atlanta, Georgia 30326-1380
>Email: rplowman@ebglaw.com
>*Pro Hac Vice*

>Kristen Pollock McDonald
>EPSTEIN BECKER & GREEN P.C.
>945 East Paces Ferry Road, Suite 2700
>Atlanta, Georgia 30326-1380
>Email: kmcdonald@ebglaw.com
>*Pro Hac Vice* Pending

Christy Durdan Jordan, Esq.
EPSTEIN BECKER & GREEN P.C.
945 East Paces Ferry Road, Suite 2700
Atlanta, Georgia 30326-1380
Email: CDJordan@ebglaw.com
*Pro Hac Vice*

Britt K. Latham, Esq.
BASS, BERRY & SIMS
AmSouth Center
315 Deaderick Street, Suite 2700
Nashville, Tennessee 37238-3001
Email: blatham@bassberry.com
Tel.: (615) 742-6200

*Attorneys for Defendants*

Michael Kevin Bassham, Esq.
Email: michael.bassham@state.tn.us
Peter M. Coughlan, Esq.
Email: peter.coughlan@ag.tn.gov
Tennessee Attorney General's Office
P. O. Box 20207
Nashville, Tennessee 37202
Tel.: (615) 741-3491


WILBANKS & BRIDGES, LLP

By: _____s/ TYRONE M. BRIDGES_____
       TYRONE M. BRIDGES
       Georgia Bar No. 081500

3414 Peachtree Road, N.E.
Suite 1075
Atlanta, Georgia, Georgia 30326
Tel.: (404) 842-1075

Attorneys for Plaintiff/Relator

19