# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and the STATE OF TENNESSEE *ex rel.,* KAREN J. HOBBS | ) ) ) ) | |
| Plaintiffs, | ) | CIVIL ACTION FILE NO. |
| v. | ) | 3:06-1169 |
| | ) | |
| MEDQUEST ASSOCIATES, INC; BIOIMAGING AT CHARLOTTE, INC.; BIOIMAGING OF COOL SPRINGS, INC.; and BIOIMAGING AT HARDING, INC. (now known as BIOIMAGING AT EDMONDSON) | ) ) ) ) ) | JUDGE HAYNES |
| Defendants. | ) ) | |

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION TO COMPEL

MedQuest Associates, Inc. ("MedQuest"), BioImaging at Charlotte, Inc. ("Charlotte Center"), BioImaging of Cool Springs, Inc. ("Cool Springs Center") and BioImaging at Harding, Inc. ("Harding Center") (collectively, "Defendants"), pursuant to Fed. R. Civ. P. 37, hereby file this Memorandum of Law in Support of Their Motion to Compel.[1]  Throughout discovery, the United States of America (the "Government") has attempted to thwart the discovery process in an effort to inhibit Defendants from effectively defending themselves.   Indeed, one such egregious example is the fact that the Government has refused *outright* to produce its investigatory file, even though Defendants specifically excluded attorney notes and mental impressions in their requests, while at the same time the Government has declined to state that it will not use witness statements and/or documents in its investigatory file in the prosecution of

---

[1] Pursuant to LR 37.01(b)(3), Defendant's counsel hereby attaches as Exhibit 1 a statement certifying that they have conferred with counsel for the Government in a good faith effort to resolve the issues raised.  Furthermore, pursuant to LR 37.01(a), Defendants hereby attach as Exhibit 2 the Joint Written Statement of Discovery Issues ("Parties Joint Discovery Statement") [Doc. 104], which was filed in this Court on December 23, 2010.

this case. The fact that the Government may use portions of its investigatory file to prosecute this case and yet refuse to produce the relevant documents is an affront to the litigation process.

Also with regard to its investigatory file, the Government has refused outright to produce the Tennessee Attorney General's declination to pursue Defendants, particularly its legal basis and/or evaluation of the state law issues which are at the core of the Government's Charlotte allegation. To the extent that Defendants cannot obtain any of these materials elsewhere, such as witness statements, documents produced by witnesses, and the Tennessee AG's declination decision and basis therefore, then Defendants' need for the information clearly outweighs the public interest, if any, in maintaining the confidentiality of the materials. As such, Defendants respectfully request that the Government's investigation file, with the exception of attorney notes and mental impressions, be produced in response to Defendants' written discovery requests.

In addition to refusing to produce any portion of its investigatory file, the Government also has refused to produce a documentation hold letter related to this litigation, as well as an internal Centers for Medicare and Medicaid Services' ("CMS") briefing addressing Independent Diagnostic Testing Facilities ("IDTFs") which goes to the core of the Government's Charlotte allegation and its Physician Supervision Allegation. In each instance of refusing to produce the requested documents, the Government has asserted a privilege (*i.e.*, investigatory privilege, attorney-client privilege, and/or deliberative process privilege), and yet in each instance, the Government cannot meet its burden as to why the privilege applies to prevent the production of discoverable information.

The Government's improper assertion of privileges, particularly as it relates to CIGNA, is particularly troubling in light of the Government's actions in producing the CIGNA files as part of its Initial Disclosures on January 6, 2010. As part of its Initial Disclosures, the Government

produced approximately 10,000 pages that ostensibly represented a complete copy of CIGNA's provider enrollment files, although the documents lacked any organization whatsoever. The documents were so disorganized that Defendants were unable to locate a complete provider enrollment file for any of the three BioImaging Centers. Due to this disorganization of the Government's production, Defendants were left no alternative but to serve *subpoenas duces tecum* upon the CIGNA witnesses identified by the Government as non-retained and non-specially employed experts in this matter, (eight months after the Government's Initial Disclosures) at which time, Defendants <u>first</u> learned that critical CIGNA provider enrollment files were <u>not</u> in CIGNA's possession. Accordingly, in September, just two weeks before the depositions of three (3) of the Government's non-retained and non-specially employed CIGNA witnesses were to take place, Defendants were informed by CIGNA's in-house counsel that CIGNA would <u>not</u> be producing any documents responsive to the *subpoenas duces tecum* served with the deposition notices.

In an attempt to obtain the subpoenaed documents, including complete enrollment files for the BioImaging Centers, Defendants were forced to serve a *subpoena duces tecum* on Cahaba, which was awarded the carrier contract for Tennessee in August 2009 and thus, Defendants learned later, received CIGNA's provider enrollment files in September <u>2009</u>. Because Cahaba had no involvement in the BioImaging Centers' applications, Cahaba was unable to produce the documents until approximately one month after three (3) of the CIGNA depositions took place. Due to the Government's actions, and in order to complete discovery timely and accommodate the schedules of the various witnesses, Defendants were forced to take depositions of CIGNA representatives without complete enrollment files on any of the BioImaging Centers. As a result, the three CIGNA witnesses provided incomplete and evasive

answers to critical questions including on the Charlotte Center's application to convert from a physician's office to an IDTF. What became quite apparent is that the Government attempted to stymie Defendants' ability to defend itself by producing tens of thousands of purported CIGNA documents, with no organization whatsoever, while simultaneously withholding relevant information that CIGNA no longer had possession of these documents. Thus, Defendants were robbed of critical time to obtain complete enrollment files to review in preparation for and to incorporate as exhibits in CIGNA employee depositions, and were significantly prejudiced in their ability to obtain complete answers to questions necessary to their defense.

As a final indication of the pattern of practice in which the Government has engaged during the discovery process, the Government improperly responded to a request for admission propounded by Defendants. Indeed, the Government responded in a manner that conflicted with legal authority as well as testimony of the CIGNA's Medical Director, which the Government has identified as a non-retained and non-specially employed expert.

For the above reasons, Defendants respectfully request that the Court provide the relief requested below pursuant to Fed. R. Civ. P. 37.

## I.     <u>Argument and Citation to Authority</u>

**A.     Defendants Seek Production of the Government's Investigation File, <u>Not</u> Including Attorney Notes and Mental Impressions, which the Government Has Improperly Refused to Produce.**

In their First Request for Production of Documents to the United States, Request No. 9, Defendants requested:

> Every Document which records, reflects, evidences or relates to any investigation by the United States of Relator's voluntary disclosures or any allegation contained therein.

*See* Defendants' First Request for Production of Documents, Request No. 9, relevant excerpts attached hereto and incorporated herein as Exhibit 3. The Government responded as follows:

The request seeks work product and documents protected by the attorney client, investigative and deliberative process privileges. However, subject to and without waiving the foregoing objections, exclusive of documents attached to the Complaint in Intervention, previously produced by the Defendants to the United States, and documents already produced with the United States' Initial Disclosures, documents in the Plaintiff's custody and control are produced herewith. Plaintiff will supplement this request with any additional such documents that come into its custody and control.

*See* United States of America's Response to Defendants' First Request for Production of Documents, Request No. 9, relevant excerpts attached hereto and incorporated herein as Exhibit 4. Thereafter, the Government supplemented its response as follows:

This request is overbroad and seeks work product and documents protected by the attorney client, investigative and deliberative process privileges. However, subject to and without waiving the foregoing objections, exclusive of documents attached to the Complaint in Intervention, previously produced by the Defendants to the United States, and documents already produced with the United States' Initial or Supplemental Disclosures or in discovery, documents produced by Defendants, documents produced by Relator, documents produced by any deponent, or pursuant to any subpoena served by defendants in the case, documents in the Plaintiff's custody and control are produced herewith.

*See* United States of America's First Supplemental Response to Defendants' First Request for Production of Documents, Request No. 9, relevant excerpts attached hereto and incorporated herein as Exhibit 5.

Although the Government produced certain documents as part of a supplemental response to Request No. 9, a simple review of these documents shows that none of the documents appear to be investigation file materials. This fact is further established by correspondence and telephone conferences, in which the Government has refused outright to produce documents relating to the government's investigation of Relator's voluntary disclosure or any allegations contained therein. Defendants have repeatedly discussed with the Assistant United States Attorney ("AUSA") that they are <u>not</u> seeking attorney notes from witness interviews or mental impressions. Rather, Defendants are seeking, in part, witness statements and/or documents provided by witnesses to the Government, <u>particularly if the Government</u>

intends to rely upon any such statements or documents to prove an element of its case against Defendants. A refusal to produce such materials, no doubt, will inhibit Defendants' ability to effectively defend themselves,[2] particularly when the Government has declined to state that it will not use those statements and/or documents in its prosecution of this case.

Also relevant in the investigation file is the declination decision of the Attorney General for the State of Tennessee ("Tennessee AG") and particularly its legal basis and/or evaluation of the state law issues. Indeed, the continuation of Williams S. Witt, M.D.'s ("Dr. Witt") physician practice at the Charlotte Center during the relevant time period, which involves state law issues relating to certificate of need and physician practices, is at the heart of the Government's Charlotte allegation.[3] The fact that the Tennessee AG declined to pursue Defendants, including on the very allegation involving those state law issues, clearly is relevant to whether there is any support for the allegations that Defendants violated the False Claims Act ("FCA"). Furthermore, to the extent that Defendants cannot obtain any of these materials elsewhere, such as the Tennessee AG's declination decision and basis therefore,[4] then Defendants' need for the information clearly outweighs the public interest, if any, in maintaining the confidentiality of the materials. Moreover, the Court's search for the truth clearly outweighs any claim of confidentiality by the Government. Nonetheless, and despite a good faith conference, the

---

[2] *See*, *e.g.*, *Lewis v. Chicago*, 2004 U.S. Dist. LEXIS 23425, * 8-9 (N.D. Ill. 2004) (finding that the plaintiffs in a civil rights action had a strong interest in obtaining the statements of witnesses who had knowledge of the events at issue). For the Court's convenience, a copy of *Lewis v. Chicago* is attached hereto as Exhibit 6.

[3] For reference, the Charlotte allegation concerns whether the Charlotte Center was a physician's office or an Independent Diagnostic Testing Facility for a specific period of time. *See* Government's Complaint-in-Intervention [Doc. 49] at ¶¶ 35-50, 72-73. Moreover, the Government has produced hundreds of pages from Tennessee's certificate of need agency, yet refuses to produce the Attorney General's evaluation/investigation and its basis for declining intervention.

[4] Defendants' attempts to obtain this information directly from the Tennessee AG's office have not been fruitful.

Government remains steadfast in its position not to produce its investigation file on the grounds of an investigatory privilege without further explanation.

In evaluating the Government's claim of investigatory privilege, it is important to note that courts have afforded <u>limited</u> protections under this or other related privileges, especially in situations in which the asserting party intends to rely on investigation materials to prove its case.[5] Furthermore, it is the litigant seeking to claim the privilege who has the burden of justifying its application.[6] Consequently, it is the <u>Government</u> which must demonstrate "<u>with particularity</u> the information for which protection is sought, and explain why the information falls within the scope of the privilege."[7] Defendants contend that the Government has failed to meet its burden.

To that end and despite Defendants' requests, the Government has refused to provide <u>any</u> information as to the contents of its investigatory file, let alone the particulars. This outright refusal to provide information extends to instructing the Office of Inspector General Special Agent ("OIG Special Agent") assigned to interview "persons with knowledge" from even testifying as to whether an interview took place.[8] Other than to reference the "Nature of Documents" as reports of interviews and conversations, which Defendants do not seek if they

---

[5] *See*, *e.g.*, *United States ex rel. Stone v. Rockwell Int'l Corp.*, 144 F.R.D. 396, 402 (D. Colo. 1992) (concluding that the investigatory privilege had been waived because the asserting party had filed an action and thereby placed the investigation materials at issue, thus making these materials relevant to the case and vital to the defendant's defense).

[6] *See*, *e.g.*, *Lewis*, 2004 U.S. Dist. LEXIS at *6 (finding that the government officials did not demonstrate a need for the assertion of the investigative privilege).

[7] *Hernandez v. Longini*, 1997 U.S. Dist. LEXIS 18679, *4 (N.D. Ill. 1997) (emphasis added). For the Court's convenience, a copy of *Hernandez v. Longini* is attached hereto as Exhibit 7.

[8] *See* Deposition of Special Agent Haines ("Haines Deposition") at 53:7-54:3, 73:4-16, and 84:14-105:24, relevant excerpts attached hereto and incorporated by reference herein as Exhibit 8.

involve attorney notes or mental impressions, the Government has not provided the type of detail necessary to meet its burden of establishing the privilege.[9]

In determining whether a government agency has met its burden to establish the investigatory privilege, courts routinely weigh several factors, including the importance of the information sought. *See Frankenhauser v. Rizzo*, 59 F.R.D. 339, 344 (E.D. Pa. 1973).[10] Most of these factors evaluate the need for informants to remain anonymous. Obviously this anonymity is most pertinent in criminal matters.[11] Clearly, there is no criminal proceeding in this matter which would sway the balancing of these factors to uphold the privilege. Weighing the factors in this case, the Government cannot argue in good faith that there is any chilling effect on the public's willingness to come forward, particularly in light of the fact that the Government has already disclosed persons with knowledge in its Initial Disclosures.[12] To the extent that the

---

[9] Given that the Government lists only "reports of interviews and conversations regarding MedQuest investigation" as privileged documents, an argument can be made that the Government has no claim of privilege as to the remaining documents in the investigation file, which are the very documents that Defendants actually seek. *See* United States Supplemental Responses to Defendants' First Request for Documents, Request No. 43 (Exhibit 5).

[10] The factors in the *Frankenhauser* case include: (1) the extent to which disclosure will thwart governmental processes by discouraging citizens from giving the government information; (2) the impact upon persons who have given information of having their identities disclosed; (3) the degree to which governmental self-evaluation and consequent program improvement will be chilled by disclosure; (4) whether the information sought is factual data or evaluative summary; (5) whether the party seeking discovery is an actual or potential defendant in any criminal proceeding either pending or reasonably likely to follow from the incident in question; (6) whether the police investigation has been completed; (7) whether any interdepartmental disciplinary proceedings have arisen or may arise from the investigation; (8) whether the plaintiff's suit is non-frivolous and brought in good faith; (9) whether the information sought is available through other discovery or from other sources; (10) the importance of the information sought to the plaintiff's case. See *Frankenhauser*, 59 F.R.D. at 344.

[11] *See id.*

[12] *See, e.g.*, *Maki v. United States*, 2008 U.S. Dist. LEXIS 31496, *19-20 (W.D. Va. 2008) (finding that the balance of factors weighed in favor of disclosure when there was no revelation of confidential sources and that government witnesses had already been identified); *Anderson v. Marion County Sheriff's Dept.*, 220 F.R.D. 555, 565 (S.D. In. 2004) (finding that the balance weighed in favor of disclosure of documents when, among other factors, the government had

Government has obtained statements and/or documents from individuals as part of its investigation of this matter and intends to rely upon those statements and/or documents in any way, those materials should be produced.

Furthermore, where the defendants' need for the information outweighs the public interest in maintaining the confidentiality of the materials, courts have required investigation materials to be produced.[13] Although the Government argues in the Joint Written Statement of Discovery Issues that Defendants could simply conduct interviews on its own, according to the Government, there are *fifty-four (54) individuals* who purportedly are "likely to have discoverable information that the plaintiff may use to support its claims." *See* United States' Initial Disclosures at 2-9, attached hereto and incorporated by reference herein as Exhibit 10. Due to the significant number of individuals identified in the Government's Initial Disclosures, as well as the Government's unwillingness to identify the most relevant individuals to whom Defendants may serve non-party document requests and/or subpoenas, Defendants have no ability to effectively duplicate the information contained in the Government's investigation file.

In short, the Government cannot meet its burden of establishing a proper invocation of the investigatory privilege. As demonstrated above, in weighing the relevant factors as well as the undue burden on Defendants to attempt to find the investigation materials elsewhere, along with the absence of any prejudice to the Government in producing the investigation file, Defendants' request for the investigative file is completely appropriate and the Government's

---

already disclosed the identity of individuals who gave statements in the investigation). For the Court's convenience, Defendants have attached a copy of the *Maki v. United States* case as Exhibit 9.

[13] *See*, *e.g.*, *R.C.O. Reforesting v. United States*, 42 Fed.Cl. 405, 409-410 (Ct. Fed. Claims 1998) (finding that the investigatory files privilege is qualified and that protected information must be disclosed if the defendants' need for the information outweighs the public interest in nondisclosure).

- 9 -

refusal to provide the file is improper. This is particularly true where the Government has identified 54 individuals whose information it "may use to support its claims." Therefore, Defendants respectfully request that this Court instruct the Government to produce the entire investigation file, with the exception of attorney notes and/or mental impressions.

**B.** **Defendants Seek a Ruling That the Document Hold Letter Was Issued to Third Persons and Is Not Protected by the Attorney-Client Privilege.**

In Defendants' Second Request for Production of Documents, Request No. 1, Defendants requested:

> Copies of any and all documents related to communications sent to CMS, CIGNA, or any other person or entity instructing them not to destroy any documents or other evidence related to this case.

*See* Defendants' Second Request for Production of Documents, Request No. 1, relevant excerpts attached hereto and incorporated herein as Exhibit 11; s*ee also* Subpoena to Custodian of Records for Center for Medicare & Medicaid Services, Request No. 4 ("Copies of any and all documents related to communications sent to CMS instructing them not to destroy any documents or other evidence related to this case"), attached hereto and incorporated by reference herein as Exhibit 12. The Government responded as follows:

> Objection: The request seeks work product and documents protected by the attorney client, investigative, and deliberative process privileges.

*See* United States of America's Responses to Defendants' Second Request for Production of Documents, Request No. 1, relevant excerpts attached hereto and incorporated by reference herein as Exhibit 13.

During the deposition of Susan Strauchman, a non-retained and non-specially employed Government expert and representative of CIGNA Government Services ("CIGNA"), numerous documents, which were produced by CIGNA the evening prior to the third CIGNA deposition, were entered as exhibits. One such document, identified as Exhibit 34D and dated April 9, 2010,

is a document hold letter concerning the current litigation ("Document Hold Letter"). Clearly, the Document Hold Letter is responsive to both Request No. 1 of Defendants' Second Request for Production of Documents as well as Request No. 4 to the CMS Subpoena, yet, <u>at no time</u> did the Government produce the Document Hold Letter or even reference its existence.

A simple review of the Document Hold Letter produced during Ms. Strauchman's deposition reveals that the Document Hold Letter was addressed to <u>all</u> Fiscal Intermediaries, Carriers, Durable Medical Equipment Medicare Contractors ("DME MACs") and Part and Part B Medicare Administrative Contractors ("A/B MACs").[14] Nearly a week after the conclusion of Ms. Strauchman's deposition, counsel for CIGNA asked for the Document Hold Letter to be returned on the grounds it was inadvertently disclosed, although <u>no</u> claim of privilege was asserted by CIGNA's counsel as justification for the return of the document. Then, several days later, the AUSA asked for return of the Document Hold Letter claiming attorney-client privilege. Pursuant to Fed. R. Civ. P. 45(d)(2), Defendants agreed to sequester a copy of the Document Hold Letter and indicated to the Government and CIGNA that Defendants would not have any objection to the court reporter removing a copy from the deposition until such time as this Court makes a determination on the AUSA's claim of privilege. To date, the Document Hold Letter remains sequestered, although Defendants contend that no privilege, let alone an attorney-client privilege, protects the disclosure of this document. Given the age of some of the documentary evidence in this matter, as well as the Government's failure to assure relevant documents were maintained and available for discovery purposes, the late date of the Document Hold Letter makes it clearly relevant.

---

[14] Because Defendants are Part B suppliers, their claims and enrollment applications are submitted solely to carriers. Thus, Defendants would have no involvement with fiscal intermediaries. Nor do Defendants qualify as DME suppliers. And, thus, Defendants would have no involvement with DME MACs.

With regard to the Government's claim of attorney-client privilege, Defendants contend that the dissemination of the Document Hold Letter to numerous outside entities, including to **ALL** Fiscal Intermediaries, Carriers, DME MACs and A/B MACs destroys any evidentiary privilege that may have otherwise applied to the Document Hold Letter. This is particularly true because none of these entities to whom the Document Hold Letter is addressed are a party to this litigation. Nor do any, with one exception, of these entities have any involvement in the matter currently pending before this Court. Indeed, the only entity that has any involvement is CIGNA, one of multiple carriers across the country.

Furthermore, the Government's questionable claim of attorney-client privilege to withhold use of the Document Hold Letter is particularly troubling in light of the Government's actions in producing the CIGNA files as part of its Initial Disclosures on January 6, 2010. As part of its Initial Disclosures, the Government produced approximately 10,000 pages that ostensibly represented a complete copy of CIGNA's provider enrollment files. Although the documents contained CIGNA bates numbers, they lacked any organization whatsoever. The documents were so disorganized that Defendants were unable to locate a complete provider enrollment file for any of the three BioImaging Centers. Only after Defendants served *subpoenas duces tecum* upon the CIGNA witnesses identified by the Government as non-retained and non-specially employed experts in this matter, (eight months after the Government's Initial Disclosures) did Defendants learn that critical CIGNA provider enrollment files were not in CIGNA's possession. Indeed, in September, just a few weeks before the depositions of three (3) of the Government's non-retained and non-specially employed CIGNA witnesses were to take place, Defendants were informed by CIGNA's in-house counsel that CIGNA was not in possession of the relevant files but would work with Cahaba toward obtaining the documents

prior to the scheduled depositions. *See* Email correspondence between defense counsel and Sally Williams, dated September 7-8, 2010, attached hereto and incorporated by reference herein as Exhibit 14. Unfortunately, the AUSA intervened and just prior to the deposition, Defendants were informed that CIGNA would <u>not</u> be producing any documents responsive to the *subpoenas duces tecum* served with the deposition notices. *See* Email correspondence between defense counsel and Sally Williams, dated September 14, 2010, attached hereto and incorporated by reference herein as Exhibit 15.

In an attempt to obtain the subpoenaed documents, including complete enrollment files for the BioImaging Centers, Defendants were forced to serve a *subpoena duces tecum* on Cahaba, which was awarded the carrier contract for Tennessee in August 2009 and thus, Defendants later learned, received CIGNA's provider enrollment files in September <u>2009</u>.[15] Because Cahaba had no involvement in the BioImaging Centers' applications, Cahaba was unable to produce the documents until approximately one month after three (3) of the CIGNA depositions took place. Thus, and in order to complete discovery timely and accommodate the schedules of the various witnesses, Defendants were forced to take depositions of CIGNA representatives without complete enrollment files on any of the BioImaging Centers. As a result, these three CIGNA witnesses provided incomplete and evasive answers to critical questions including on the Charlotte Center's application to convert from a physician's office to an IDTF. As a further result of CIGNA not being in possession of the complete enrollment files, the CIGNA employee who had been assigned to process the very BioImaging Centers' applications

---

[15] Although Defendants were unaware of the transfer of files from CIGNA to Cahaba, the AUSA was well aware of this fact, and in 2009 reviewed CIGNA's provider enrollment files and obtained copies of documents <u>just prior to the transfer of the files from CIGNA to Cahaba</u>. *See* Deposition of Amanda Green ("Green Deposition") at 20:2 – 24:13, 32:7-33:18, relevant excerpts attached hereto and incorporated by reference herein as Exhibit 16.

at issue herein, was unable to recall any of her involvement in the transition of the Charlotte Center to an IDTF.[16] Thus, Defendants were stymied in their attempts to develop testimony from the carrier showing that there was no intent to defraud the government in the application process. Because knowledge is a critical element to any FCA action, the inability to develop testimony regarding the actions taken by Defendants in relation to the application process is highly prejudicial to Defendants and was the direct result of the Government's failure to issue a document hold <u>until March, 2010</u>, three years after the Government began its investigation in this matter and six (6) months after the transfer of these highly relevant materials. These actions clearly demonstrate the relevance of the Document Hold Letter, including to spoliation issues inherent in the incomplete and evasive answers provided by the Government's non-retained and non-specially employed CIGNA experts in this matter.

In light of the clear relevance of the document, the burden shifts to the Government to establish the elements of the attorney-client privilege. This the Government has completely failed to do. First, as stated above, the Document Hold Letter was sent to third parties, which destroys any privilege that may have otherwise existed. As a general rule, parties waive attorney-client privilege when they voluntarily disclose private communications to third parties.[17] Second, from a review of the Letter, there is nothing to indicate that any of the entities listed on the Document Hold Letter were seeking legal advice.[18] As such, there is nothing to

---

[16] The inability to recall her involvement is truly astounding given that the AUSA met with the deponent and indeed, prepared her for her deposition testimony. *See* Deposition of Mary Ann Johnson ("Johnson Deposition") at 52:12-22, relevant excerpts attached hereto and incorporated by reference herein as Exhibit 17.

[17] *See In re Grand Jury Proceedings October 12, 1995*, 78 F.3d 251, 254 (6th Cir. 1996) (finding that a party had waived the privilege by disclosing the substance of their attorney's advice to a third party).

[18] *See, e.g., Fisher v. United States*, 425 U.S. 391, 403 (1976) (noting that the attorney-client privilege "protects only those disclosures – necessary to obtain informed legal advice – which

support a finding that the Document Hold Letter constitutes an attorney-client communication. Because there is no privileged communication, the Document Hold Letter should be produced.

There can be no question that the Government's actions resulted in evasive and incomplete answers provided by the CIGNA witnesses. The 2010 date on the Document Hold Letter clearly reveals the absence of document hold instructions to CIGNA at a time when CIGNA, which processed the relevant applications, was in possession of highly relevant materials.[19] The Government's current attempt to withhold use of the document by asserting a privilege over the Document Hold Letter, despite a clear lack of any privileged communication, appears to be a continuation of the practice to stymie the discovery process and interfere with Defendants' ability to defend themselves.

**C.  Defendants Seek An Internal CMS Office of Administration Briefing Which the Government Has Refused to Produce on the Grounds of the Deliberative Process Privilege.**

Defendants served the Government a Second Request for Production of Documents, which contained several requests for guidance from CMS on the topics of IDTFs, including in the form of change requests, Joint Signature Memoranda, and Technical Direction Letters. Specifically, Defendants requested the following:

---

would not have been made absent the privilege"). *See also Diversified Industries, Inc. v. Meredith*, 572 F.2d 596, 609 (8th Cir. 1978) (finding that attorney-client privilege is only applicable if "1) the communication was made for the purpose of securing legal advice; (2) the employee making the communication did so at the direction of his corporate superior; (3) the superior made the request so that the corporation could secure legal advice; (4) the subject matter of the communication is within the scope of the employee's corporate duties; and (5) the communication is not disseminated beyond those persons who, because of the corporate structure, need to know its contents.") (emphasis added).

[19] All of the CIGNA witnesses testified that they had not received a document hold instruction. *See* Green Deposition at 34:14-20 (Exhibit 16); Deposition of Jackie Jones Guerrero ("Guerrero Deposition") at 15:6-8, relevant excerpts attached hereto and incorporated by reference herein as Exhibit 18.

Request No. 9: Copies of any and all change requests from CMS addressing physician supervision of diagnostic studies performed at IDTFs from December 2000 to the present ("Relevant Time Period").

Request No. 10: Copies of any and all Joint Signature Memoranda from CMS addressing physician supervision of diagnostic studies performed at IDTFs during the Relevant Time Period.

Request No. 11: Copies of any and all Technical Direction Letters from CMS addressing physician supervision of diagnostic studies performed at IDTFs during the Relevant Time Period.

See Defendants' Second Request for Production of Documents at Request Nos. 9-11 (Exhibit 11).

Defendants also served a *subpoena duces tecum* on CMS ("CMS Subpoena"), which contained similar document requests as those quoted above. See CMS Subpoena, Request Nos. 10-12 (Exhibit 12) (containing same language as that found *supra* in Defendant's Second Request at Request Nos. 9-11).

In response to the Requests quoted *verbatim* above, the Government responded as follows:

Request No. 9: Other than the documents that have already been produced in this case, no documents have been identified that are responsive to this request.

Request No. 10: Objection: The request seeks work product and documents protected by the attorney client, investigative, and deliberative process privileges. Subject to and without waiving the objection, other than the documents that have already been produced in this case, no documents have been identified that are responsive to this request.

Request No. 11: Other than the documents already produced in this case, no documents have been identified that are responsive to this request.

See United States' Response to the Defendants' Second Request at Request Nos. 9-11 (Exhibit 13). The Government supplemented their responses to Request Nos. 9-11 and indicated for all three requests that "Documents which may be responsive to this request are hereby produced." See United States of America's Supplemental Responses to Defendants' Second Request for Production of Documents, Request Nos. 9-11, relevant excerpts attached hereto and incorporated

by reference herein as Exhibit 19. However, in correspondence enclosing the Government's purported supplemental responses to Defendants' Second Request for Production of Documents and the CMS Subpoena, the Government informed Defendants that it was "asserting as protected from disclosure by the deliberative process privilege . . . [a] 2 page, internal CMS Office of Administration 'Briefing' related to IDTF proposals to be included in the Physician Fee Final Rule . . . ." ("CMS Briefing"). *See* Letter from L. Rivera to R. Plowman, dated December 10, 2010, attached hereto and incorporated by reference herein as Exhibit 20. In the Parties Joint Discovery Statement, the Government now contends that the CMS Briefing is not responsive to either the Second Request for Production of Documents or the CMS Subpoena. *See* Parties Joint Discovery Statement [Doc. 104] at Exhibit 2.

The Government's latest position that the CMS Briefing need not be produced because it is allegedly not responsive to Defendants' Second Request for Production of Documents fails outright because Defendants also served the Government document requests for all documents which either support or disprove its case, which necessarily encompasses the CMS Briefing. *See* Defendants' First Request for Production of Documents, Requests Nos. 1 and 2 (Exhibit 3). Indeed, Defendants requested the following general evidentiary documents:

> Request No. 1: Every Document which records, reflects, proves or evidences any facts set forth in Your answers to Defendants' First Set of Interrogatories, served herewith.

> Request No. 2: Every Document which disproves or tends to disprove any facts set forth in Your answers to Defendants' First Set of Interrogatories, served herewith.

*See* Defendants' First Request for Production of Documents, Request Nos. 1 and 2 (Exhibit 3).

The Government responded to the general evidentiary requests as follows:

> Request No. 1: The request is overbroad and, in part, seeks work product and documents protected by the attorney client privilege, investigative, and deliberative process privileges. Where no objection is lodged, and subject to and without waiving the foregoing objections, exclusive of documents attached to the Complaint in Intervention

and documents already produced within the United States' Initial Disclosures, documents in the Plaintiff's custody and control are produced herewith.

Request No. 2:  [Incorporates response from Document Request No. 1].

*See* United States of America's Responses to Defendants' First Request for Production of Documents, Request Nos. 1 and 2 (Exhibit 4).  The Government supplemented their Responses as follows:

Request No. 1: Objection: See responses to Defendants' First Set of Interrogatories.  The request is overbroad and, in part, seeks works product and documents protected by the attorney client, investigative, and deliberative process privileges.  Where no objection is lodged, and subject to and without waiving the foregoing objections, exclusive of documents attached to the Complaint in Intervention and documents already produced with the United States' Initial and Supplemental Disclosures or in discovery, documents produced by defendants, documents produced by Relator, documents provided by CIGNA, CMS, Cahaba, any subpoenaed documents provided to defendants, or provided to or used by defendants at a deposition in this matter, documents in the Plaintiff's custody and control are produced herewith.

Request No. 2: Plaintiff is unaware of any such documents but will supplement if necessary.

*See* United States of America's First Supplemental Response to Defendants' First Request for Production of Documents, Request Nos. 1 and 2 (Exhibit 5).  Although in its initial Response as well as its Supplemental Response, the Government indicates documents were produced, no document purporting to be the CMS Briefing was included in either production based on the description of the document provided by the AUSA.

Because Defendants have not been provided a copy of the CMS Briefing, Defendants cannot describe the nature of this document, to whom it was addressed, the author of the document, or even the timeframe.  However, based on the description of the document provided by the AUSA, the CMS Briefing clearly addresses IDTFs which is at the heart of the Government's FCA case against Defendants.  It further goes to the core of one of Defendants' defenses on this issue, *i.e.*, that there is no statute or regulation, nor even CMS guidance,

prohibiting the use of physicians to provide contrast coverage. Based on the description of the document and particularly the lack of any <u>CMS</u> guidance on an issue at the core of one of Defendants' defenses, the document appears either highly relevant or likely to lead to the discovery of admissible evidence. Furthermore, because the Government acknowledges that the CMS Briefing addresses a core issue in the case (*i.e.*, IDTF requirements), then Defendants are entitled to the CMS Briefing under either of the two requests seeking documents supporting or disproving the Government's case.

In further evaluating whether Defendants are entitled to the CMS Briefing, it is important to note that at <u>no</u> time have Defendants received any form of response <u>from CMS</u> with regard to the CMS Subpoena. Instead, the AUSA responded to the CMS Subpoena. *See* December 10, 2010 Letter from L. Rivera (Exhibit 20). When Defendants inquired about the grounds for withholding the CMS Briefing during the good faith conference, the AUSA explained that CMS counsel will not produce the CMS Briefing based on a deliberative process privilege. Although CMS has never asserted this privilege directly to Defendants, including in response to a subpoena served upon it, the AUSA stated in a letter to Defendants' counsel that the Government is asserting the privilege *on behalf of* CMS.

A simple assertion by the AUSA, contained in a letter to Defendants' counsel, that a document is privileged is insufficient to meet the burden of establishing the elements necessary to assert the privilege. Indeed, the Government has failed to identify any reasons for why CMS' deliberative process privilege should prevent production of the CMS Briefing. Even were the Government able to articulate some confidentiality basis for asserting the privilege, this concern is easily rectified by the Protective Order issued in this matter which provides that specific actions be taken to assure the confidentiality of documents marked confidential and/or

proprietary.  *See* Consent Protective Order Governing the Disclosure of Health and Confidential Information.  [Doc. 91].  Certainly if the CMS Briefing sheds light on CMS' position with respect to IDTFs, then both Defendants and this Court are entitled to the benefit of CMS' position.  Conversely, if the CMS Briefing does not truly address the issues herein, then in light of the Protective Order, there would be no prejudice to CMS in producing the CMS Briefing.  Accordingly, there is no legitimate reason for the government to withhold production of the CMS Briefing and it should be produced to Defendants.

**D.** **Portions of the Government's Response to Request for Admission No. 1 Are Inaccurate and Not Supported by the Law or Sworn Testimony and thus Should Be Struck and the Request for Admission Be Deemed Admitted.**

Defendants also challenge the Government's response to Defendants' Request for Admission No. 1, particularly that portion which is not supported by any authority, legal or otherwise.  Accordingly, Defendants request that the Government's Response be struck and the Request for Admission be deemed admitted.  Specifically, Request for Admission No. 1 requests the Government to:

> Admit that CMS has not issued any guidance addressing medical specialty requirements for physician supervision of diagnostic imaging tests with contrast medium in an Independent Diagnostic Testing Facility.

*See* Defendants' First Request for Admissions to the United States of America, Request No. 1, relevant excerpt attached hereto and incorporated by reference herein as Exhibit 21.  In response, the Government stated in relevant part that:

> As indicated in deposition testimony in the case, LMRPs and LCDs are approved by CMS, and cannot be implemented without the necessary notice and comment period, and approval by CMS.

*See* United States' Response to Defendants Request for Admission No. 1, relevant excerpts attached hereto and incorporated by reference herein as Exhibit 22.

The Government's response to Request for Admission No. 1 is flawed for several reasons. First, there is no legal authority to support the Government's contention that LMRPs and LCDs purportedly undergo a "necessary notice and comment period." Second, LMRPs and LCDs are by definition carrier policies, and thus, cannot constitute CMS guidance. Third, CIGNA's Medical Director, Dr. Gary Oakes, testified that the LMRPs (now referred to as LCDs) are put in a database that is available for CMS to review should they choose to do so. *See* Deposition of Gary Oakes ("Oakes Deposition") at 56:10-14 (emphasis added), relevant excerpts attached hereto and incorporated by reference herein as Exhibit 23. Dr. Oakes' testimony does not support a finding that LMRPs and/or LCDs undergo a formal approval process, let alone the type of approval process that would constitute "CMS guidance." Finally, the availability of a document for review by CMS does not support a finding that LMRPs or LCDs cannot be implemented without approval by CMS.

Because there is no support, legal or otherwise, for the Government's response to Request for Admission No. 1, Defendants request the Government's response be struck and the Request be deemed admitted pursuant to Fed. R. Civ. P. 36(a)(6).

## II.    Conclusion

Throughout discovery, the Government has attempted to thwart the discovery process in an effort to inhibit Defendants from effectively defending themselves. Whether it is refusing to produce otherwise discoverable documents under the guise of various privileges that do not apply or inaccurately responding to a request for admission that is contrary to legal authority and the deposition testimony of its own non-retained and non-specially employed expert, the Government's pattern remains the same – to prevent Defendants from successfully defending themselves in a  FCA action in which Defendants face possible damages and liabilities in excess

of $10 million.  For the reasons set forth above, Defendants respectfully request this Court award the relief requested in this Memorandum in Support.

This 28th day of December, 2010.

NELSON MULLINS RILEY & SCARBOROUGH LLP

s/ Rebekah N. Plowman
Rebekah N. Plowman
Georgia Bar No. 531044
Email:  rebekah.plowman@nelsonmullins.com
*Admitted Pro Hac Vice*
Kristen Pollock McDonald
Georgia Bar No. 388558
Email:  kristen.mcdonald@nelsonmullins.com
*Admitted Pro Hac Vice*

201 17th Street, NW
Suite 1700
Atlanta, Georgia 30363
Telephone:  (404) 322-6000
Facsimile:  (404) 322-6059
150 Third Avenue South, Suite 2800
Nashville, TN 37201
Britt K. Latham
Bass, Berry & Sims
(615) 742-6200
Email: blatham@bassberry.com
Attorneys for Defendants

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA and the STATE OF TENNESSEE** *ex rel.,* **KAREN J. HOBBS** | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION FILE NO. |
| v. | ) | 3:06-1169 |
| | ) | |
| **MEDQUEST ASSOCIATES, INC; BIOIMAGING AT CHARLOTTE, INC.; BIOIMAGING OF COOL SPRINGS, INC.; and BIOIMAGING AT HARDING, INC. (now known as BIOIMAGING AT EDMONDSON)** | ) ) ) ) ) | JUDGE HAYNES |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on December 28, 2010, a copy of the foregoing **DEFENDANTS'**

**MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO COMPEL** was filed

with the Clerk of Court using the CM/ECF system which will automatically send e-mail

notification of such filing to the following attorneys of record:

> Lisa Snell Rivera, Esq.
> U.S. Department of Justice
> 110 9th Avenue South
> Suite A-961
> Nashville, TN 37203
> Email: lisa.rivera@usdoj.gov
>
> Aubrey T. Givens, Esq.
> 501 Union Street, Suite 307
> Nashville, TN 37219
> Email: givenslaw@hotmail.com
>
> Marlan B. Wilbanks, Esq.
> Email: mbw@wilbanks-bridgeslaw.com
> Tyron M. Bridges, Esq.
> Email: tmb@wilbanks-bridgeslaw.com
> Wilbanks & Bridges LLP
> 3414 Peachtree Road NE, Suite 1075
> Atlanta, GA 30326

This 28th day of December, 2010.

Respectfully submitted,

s/ Rebekah N. Plowman

Rebekah N. Plowman
Georgia Bar No. 531044
Email:  rebekah.plowman@nelsonmullins.com
*Admitted Pro Hac Vice*
Counsel for Defendants