IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and the STATE OF TENNESSEE ex rel., KAREN J. HOBBS, | ) ) ) ) ) ) | 3:06-01169 JUDGE HAYNES |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| MEDQUEST ASSOCIATES, INC., BIOIMAGING AT CHARLOTTE, INC., BIOIMAGING OF COOLSPRINGS, INC., and BIOIMAGING AT HARDING, INC., now known as BIOIMAGING AT EDMONDSON, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

# MEMORANDUM

Before the Court is the Defendants' motion to reconsider under Rule 60(b) (Docket Entry No. 227). The Defendants' motion challenges the Court's earlier finding that civil penalties of five thousand five hundred dollars ($5,500) and eleven thousand dollars ($11,000) were appropriate for each Medicare billing included in the Defendants' two distinct violations of the False Claim Act, ("FCA"), 31 U.S.C.§ 3729 et seq. The Defendants assert that such an award is ten times the Government's actual damages and results in an excessive fine prohibited by the Excessive Fines Clause of the Eighth Amendment, as supported by the United States Supreme Court and Sixth Circuit precedents.

1

In its response, the United States contends, in essence: (1) that the award of treble damages and civil penalties is mandatory under the FCA; (2) that the civil penalties under the FCA serve a distinct governmental interest of deterrence aside from repayment of monies; (3) that the Defendants' persistent and widespread submissions of false Medicare claims were knowingly committed; (4) that the Defendants' violations were not technical reporting violations; (5) that under judicial precedents, the ratio of the Court's award of civil penalties to damages is well within the range of reasonableness for FCA awards; and (6) that the Court's award of less than the maximum penalties precludes an excessive fine challenge under the Eighth Amendment. (Docket Entry No. 229).

Plaintiff, Karen Hobbs, a former employee of MedQuest Associates, Inc. filed this action as Relator on behalf of the United States, under the False Claims Act, ("FCA"), 31 U.S.C. §§ 3729 through 3733 against the Defendants: MedQuest Associates, Inc., ("MedQuest"), BioImaging at Charlotte, Inc., ("Charlotte Center"), BioImaging of CoolSprings, Inc. ("CoolSprings Center") and BioImaging at Harding, Inc. ("Harding Center"). The Defendants operate Independent Diagnostic Testing Facilities ("IDTFs") and participate in the Medicare program. On March 31, 2009, the Government notified the Court of its decision to intervene and filed its intervening complaint on May 22, 2009. (Docket Entry No. 49).

In earlier proceedings, the Court denied the Defendants' motion to dismiss (Docket Entry No. 95) concluding that Medicare regulations on physician supervision of diagnostic tests are conditions of payment and that under the factual allegations and relevant Medicare regulations, the United States and the Relator stated claims for violations of the FCA. (Docket Entry No. 94, Memorandum at 15-19).

Later, the parties filed motions for summary judgment on the FCA claims. In sum, the United States's FCA theory and proof were two-fold: (1) that Medicare regulations and Medicare's designated carrier, CIGNA, require a supervising physician for contrast testing at an IDTF to be a board certified radiologist or a physician with appropriate training and approved by CIGNA, but MedQuest submitted claims to Medicare for contrast testing at its Nashville area IDTFs by physicians who were neither radiologists nor physicians approved by Medicare in violation of these Medicare's regulations and policies; and (2) that MedQuest knowingly delayed notice of the change of ownership of its Charlotte Center to an "IDTF" from a "physician's office" and intentionally used its predecessor's Medicare provider number for Medicare payments for diagnostic tests of Medicare beneficiaries at MedQuest's Charlotte facility.

In sum, the Defendants' proof and argument were that neither Medicare regulations nor sound medical practice require a radiologist as a supervising physician because the only medical problem would be a patient's adverse reaction to a contrast injection for which any physician is qualified to address. Absent a controlling statute or regulation, the Defendants contended that any failure to satisfy a requirement of CMS and/or CIGNA, its Medicare carrier, cannot establish a FCA violation. Moreover, Defendants cited a conflict among Medicare carriers on the requirement of a radiologist for direct supervision of an IDTF's testing that also precludes any FCA liability. Defendants also assert that Medicare's backbilling policy would pay for any billing, prior to Medicare's approval of MedQuest's acquisition of the Charlotte facility as an IDTF. Defendants note that CIGNA did not take any action after notice of MedQuest's Charlotte Center's billings with Dr. Witt's Medicare billing number.

As set forth in its 77 page Memorandum (Docket Entry No. 218), the Court awarded summary judgment to the United States and found, in summary that:

3

Here, at MedQuest's Nashville area IDTFs, Defendants have a documented and undisputed history of extensive use of physicians who lacked Medicare approval to provide any supervision at an IDTF. These physicians are not shown to possess the certification or specialized training required by CIGNA. Moreover, MedQuest's Nashville area IDTF technical staff had constant difficulties with securing any physicians for coverage of contrast testing that requires direct physician supervision. As a result, the proof establishes that MedQuest's technical non-physician staff members actually injected contrast and conducted contrast studies of Medicare beneficiaries without **any** physician supervision that Section 410.33 does not authorize. MedQuest submitted Medicare claims for payment for all of those testings and by doing so, MedQuest violated its first express certification that the physicians listed in its application would supervise such testing and later, in submitting billings implicitly certified that those tests were provided in accordance with applicable Medicare regulations and by physicians approved by Medicare.

As to the knowingly or reckless disregard element, MedQuest is an experienced IDTF provider that operates in thirteen states. MedQuest has been in this market since 1998 and is now the leading IDTF firm in this market. MedQuest has a trained staff on CMS 855 form and related instructions. This supervising physician coverage for the diagnostic tests with contrast was well known to MedQuest upper management and managers of its Nashville area IDTFs. Yet, the Defendants instructed their staffs to select any doctor without regard to that doctor's "proficiency in the performance and interpretation of each type of diagnostic procedure" at the Defendants' facilities. MedQuest had a clear alternative to submit physicians who were not radiologists to be supervising physicians, but who had appropriate training as with Dr. Tan, an internist. The Court concludes that the proof establishes that MedQuest's failure to provide adequate supervising physician coverage for the diagnostic tests with contrast was so significant that MedQuest's technical staff at its Nashville area IDTFs actually conducted the diagnostic testing without **any** physician supervision.

For these reasons, the Court concludes that MedQuest's use of non-Medicare approved physicians for contrast studies represents a reckless disregard of Medicare's program integrity statute, Medicare regulations and CIGNA's requirements (expressly authorized by the Secretary's regulation) for physicians with the demonstrated capability to provide direct coverage of these tests and approved by Medicare. Defendants' extensive use for contrast studies of physicians who were neither trained nor approved by their Medicare carrier is also evidence of Defendants' reckless conduct establishing violations of the FCA. Thus, the Court concludes that the United States's proof establishes Defendants' liability under FCA precedents.

\* \* \*

Here, Dr. Witt testified that with MedQuest's acquisition of William S. Witt Inc,, his physician practice ended. Under his reading contract with MedQuest, Dr. Witt who was to provide coverage at all three of MedQuest's Nashville area IDTFs, was unavailable for

coverage of contrast tests for significant times. Such lack of availability posed difficulties for MedQuest's Nashville area IDTFs' staffs to secure physician coverage of contrast studies. MedQuest's Nashville area staff had to use physicians who were not approved by Medicare at their IDTFs for contrast tests of Medicare beneficiaries. At some local IDTFs, staff actually performed these tests of Medicare beneficiaries without **any** physician coverage. MedQuest leased this location from Dr. Witt; hired the center's managers and regional managers for the Charlotte center; obtained necessary insurance; and required that employees at the Charlotte center sign MedQuest's compliance policy. MedQuest's chief compliance officer admitted that during this time from January 2004 through June 2005, the Charlotte center was operating as an IDTF. These facts lead the Court to conclude that the Charlotte facility was not a physician's practice so as to justify the Charlotte's center's use of Dr. Witt's Medicare billing number.

Eighteen (18) months lapsed before MedQuest informed CMS of the change of ownership of the Charlotte location, Defendants billed the Medicare program for diagnostic services performed at the Charlotte center using Dr. Witt's Medicare physician provider number. Once Aetna informed CIGNA of the Charlotte center's actual owner, CIGNA required MedQuest to submit a change of information for the Charlotte facility to secure Medicare's approval. During this time period MedQuest was operating IDTFs and had to be aware of the applicable Medicare regulation that requires: " Changes in ownership ... must be reported to the Medicare fee-for-service contractor on the Medicare enrollment application within 30 calendar days of the change". 42 C.F.R. §410.33(g)(2). In face of this clear regulation, for eighteen months after this purchase, MedQuest did not inform Medicare of this change of ownership nor apply to enroll the Charlotte center in Medicare as an IDTF.

Under the Medicare backbilling policy, to backbill, MedQuest had to submit an application and be certified by a Medicare carrier. For this 18 months period, the harlotte center did not apply and thus, was also not certified to operate as an IDTF. If this omission involved a "mom and pop" operation of an IDTF, the Court would take a different view, but MedQuest is a highly sophisticated and experienced IDTF provider with operations in 13 states. The facts on the United States's second theory prove MedQuest's reckless disregard of 42 C.F.R. § 410.33(g)(2) and the Medicare backbilling policy.

(Docket Entry No. 218 Memorandum at 67-68, 73-74) (emphasis in the original with footnote deleted).

As to the award of civil penalties[1] under the FCA, 31 U.S.C. § 3729(a) provides that for a FCA violation, the Defendant "is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000 . . . **plus** 3 times the amount of damages which the Government sustains because of the act." For the appropriate measure under the FCA for its penalty award, "the court must determine '[w]ith what act, did the defendant submit his demand or request and how many such acts were there?' Thus, separate penalties are to be assessed for each request for payment, rather than for each false statement." United States ex rel. Augustine v. Century Health Services, Inc., 136 F. Supp. 2d 876, 895 (M.D. Tenn. 2000) (quoting and citing United States v. Krizek, 111 F.3d 934, 939-40 (D.C. Cir. 1997)).

As to the appropriate approach in defining demand or claims under the FCA, the Court also cited the Supreme Court's rejection of a restrictive approach that limited the effect of the statutory remedies.

> To equate the number of forfeitures with the number of contracts would in a case such as this result almost always in but a single forfeiture, no matter how many fraudulent acts the subcontractor might have committed. This result would not only be at odds with the statutory language; it would also defeat the statutory purpose.

(Docket Entry No. 218, Memorandum at 76) (quoting United States v. Bornstein, 423 U.S. 303, 304, 311 (1976)).

---

[1] "Penalty" is defined as "a sum of money exacted as punishment for either a wrong to the state or a civil wrong to the state or a civil wrong (as distinguished from compensation for the injured party's loss)," whereas "damage" is defined as [o]f or relating to monetary compensation for loss or injury to a person or property." Black's Law Dictionary (9th ed. 2009) 1247, 445.

Cuviello v. City of Oakland, 2010 WL 3063199 at *6 (N.D. Cal. Aug. 3, 2010)

The Court decided the issue of the relevant "act" for the "demand or request" should be resolved in the context of the goods or services at issue. Here, Medicare pays claims only for services provided to an "eligible individual." See 42 U.S.C. § 1395x, 1395b-3, 1395w-21 and 1395w-28. Because Defendants provided diagnostic contrast testing to Medicare eligible individuals, the Court deemed each demand for payment of contrast testing at Defendants' Nashville area IDTFs to be the appropriate bases for an award of civil penalties. See United States v. Mackby, 339 F.3d 1013, 1015, 1019 (9th Cir. 2003); Mayers v. U. S. Dept. of Health and Human Servs., 806 F.2d 995, 999 (11th Cir. 1986); United States ex rel Tyson v. Amerigroup Illinois Inc., 488 F.Supp. 2d 719, 724, 745 (N. D. Ill. 2007); United States v. Byrd, 100 F.Supp.2d 342, 344-45 (E.D.N.C. 2000)

The Court deemed the $11,000 penalty appropriate for the Defendants' use of physicians whom Medicare did not approve for contrast testing at MedQuest's Nashville area IDTFs. For the testing at the Charlotte facility by physicians who were not approved by Medicare, the Court deemed appropriate the five thousand five hundred dollars ($5,500) for each billing of a contrast test of a Medicare beneficiary. The Court made a finding on the number of false claims on the Government's first FCA claims. The Court reserved a finding of the number of false claims on the Government's second FCA claim in light of the 30 day grace period for reporting a change of ownership, as provided in 42 C.F.R. § 410.33(g)(2).

The parties later stipulated that for the Government's first FCA claim, there were 474 Medicare claims and billings for contrast testing without Medicare approved physicians. The parties also agreed that for the Government's second FCA claim, 50 claims should be excluded pursuant to the Court's ruling for a total of 945 Medicare claims and billings from MedQuest's unapproved Charlotte facility. The parties also agreed that there were 131 duplicate Medicare

claims and billings for which Medicare paid $93,727.91, but disagreed as to which FCA violation, these claims should be considered for civil penalties. The Government attributes these 131 duplicate claims to the Defendants' second FCA violation. The Defendants argue that 131 duplicate claims should be applied to the first FCA violation. In addition, the Defendants assert that of the 945 claims, Medicare did not reimburse MedQuest on 52 of those claims and those 52 claims should be deducted from any civil penalties for Defendants' second FCA violation because the Government did not suffer any loss.

Because the Government's first FCA claim is comprehensive and includes all billings for contrast testing without approved physician supervision, the Court concludes that the 131 duplicative billings should be deducted from that claim. As to the 52 unpaid claims, the Court concludes that those claims should be considered for an award of civil penalties because those claims were submitted during the operation of an IDTF that Medicare did not approve. With the exclusion of those 52 claims from the damages award, the Court recognizes the lack of a government loss.[2] In any event, "Congress specifically rejected a "no harm, no foul" argument: "'A false claim for reimbursement under the Medicare, Medicaid or similar program is actionable under the act, ... and such claim[ ] may be false even though the services are provided as claimed if, for example, the claimant is ineligible to participate in the program....'" Mackby, 339 F.3d at 1019 (quoting S.Rep. No. 99-345, at 9, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5275).

With the elimination of the duplicate billings on the first FCA violation, there are 343 false Medicare claims and billings for which Medicare paid MedQuest $250,030.31 that must be trebled under 31 U.S.C. §3279(a) to an award of $750,090.93. With 343 false Medicare claims and billings at $11,000 per claim, the civil penalty for the Defendants' first FCA violation is

---

[2] These rulings eliminate any material factual dispute on damages and penalties.

$3,773,000.00. For the second FCA violation, there were 945 false Medicare claims and billings for which Medicare paid MedQuest $463,357.26 that under 31 U.S.C. § 3279(a), must be trebled to an award of $1,390,071.78. With 945 false Medicare claims at $5,500 per claim, the civil penalty for the Defendants' second FCA violation is $5,197,500.00. Thus, the total amount awarded to the United States in this action for the Defendant's FCA violations is $11,110,662.71 in treble damages and civil penalties.

As to whether this award is "grossly disproportionate" so as to violate the Excessive Fines Clause of the Eighth Amendment, the Court first observes that, the language of 31 U.S.C. § 3729(a) renders an award of treble damages **and** civil penalties "mandatory" . United States v. Hughes, 585 F.2d 284, 286 (7th Cir. 1978); United States v. Killough, 848 F.2d 1523, 1533-34 (11th Cir. 1988). From a historical perspective, "[t]he FCA . . . was . . . enacted [to] provide[] both civil and criminal penalties against individuals who were found to 'knowingly have submitted a false claim to the Government.' These penalties included double damages for 'any false claims for money or property upon the United States' or for any individual 'who submit[s] false information in support of claims.' **On top of double damages, the FCA passed in 1863 also imposed a $2,000 civil penalty per false claim.**" S. Rep. 110-507, S. Rep. No. 507, 110th Cong., 2nd Sess. 2008, 2008 WL 4415147, at *1.(emphasis added) Congress' express penalty determination "represent[s] the collective opinion of the American people as to what is and is not excessive." U.S. v. 817 N.E. 29th Drive, Wilton Manors, Fla., 175 F.3d 1304, 1309 (11th Cir.1999). Moreover, it must be remembered that "[p]rotection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law...." Heckler v. Community. Health Servs. of Crawford County, Inc., 467 U.S. 51, 63 (1984). Participants in

the Medicare program have a duty to familiarize themselves with the legal requirements for payment. Id. at 64.

Yet, as stated in the earlier Memorandum, the award of treble damages and penalties under the FCA is limited by the Eighth Amendment's Excessive Fines Clause. (Docket Entry No. 218 at 75) (citing Mackby, 339 F.3d at 1016). Imposition of civil penalties is subject to the Eighth Amendment. Hudson v. United States, 522 U.S. 93, 103 (1997). The governing principles on this Eighth Amendment issue are set forth in United States v. Bajakajian, 524 U.S. 321, 323 (1998) that did not involve the FCA, but a criminal forfeiture. In Bajakajian, the Supreme Court stated: "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." Id. at 334. Yet, the Supreme Court also stated that "we have emphasized in our cases interpreting the Cruel and Unusual Punishment Clause" that judgments about the appropriate punishment for an offense belong in the first place to the legislature" and that "any judicial determination regarding the gravity of a particular ... offense will be inherently imprecise." Id. at 336.

For the proportionality analysis, since Bajakajian, the Supreme Court applied its principles as requiring consideration of " the degree of the defendant's reprehensibility or culpability ... the relationship between the penalty and the harm to the victim caused by the defendant's actions ... and the sanctions imposed in other cases for comparable misconduct" and the Court is to "engage in an independent examination of the relevant criteria". Cooper Industries, Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 435 (2001) (citing Bajakajian, 524 U.S. at 337, 339, 340). The burden of showing of disproportionality falls rests with the

Defendant. United States v. Jose, 499 F.3d 105, 108 (1st Cir.2007); United States v. Ahmad, 213 F.3d 805, 808 n. 1, 816 (4th Cir.2000).

To be sure, in Vermont Agency of Natural Resources v. United States ex rel Stevens, 529 U.S. 765, 784, 785 (2000), the Supreme Court observed that Section 3729(a) of the FCA "generally imposes treble damages and a civil penalty" that "are essentially punitive in nature." Yet, after Stevens, in Cook County v. United States ex rel Chandler, 538 U.S. 119 (2003), in a FCA action, the Supreme Court observed that "it is important to realize that 'treble damages have a compensatory side, serving remedial purposes in addition to punitive objections. . . [T]he facts about the FCA show that the damages multiplier has compensatory traits along with the punitive. There is no question that some liability above the amount of the fraud is usually 'necessary to compensate the Government completely for the costs, delays and inconveniences occasioned by fraudulent claims.'" Id. at 130 (quoting Bornstein, 423 U.S. at 315 (a FCA action)).

Given Cook County's observations, the Court deems one half of the total mandatory treble damages awarded here, $1,070,181.36 can serve as compensatory damages to assess the proportionality to the civil penalties award for the Eighth Amendment analysis. The Court now considers the three factors for that proportionality analysis.

### a. The Extent and Nature of the Harm Caused

Although the Defendants refer to their violations as "technical reporting violations," the Court must respectfully disagree because the facts and applicable law reveal serious violations of Medicare laws and regulations. As set forth in the Memorandum, Congress imposed a statutory mandate in 42 U.S.C. § 1395ddd(c)(1), that Medicare providers must establish their "demonstrated capability" to provide services for payment under the Medicare Act. (Docket

11

Entry No. 218, Memorandum at 51). Congress granted the Secretary the statutory authority to make determinations of a provider's qualifications and by express regulation, the Secretary designated its Medicare carriers to implement this statutory mandate. Id. at 50.

For IDTFs, a relatively new health care provider category created in 1998, the Medicare carriers set the standards for the "demonstrated capability" of a physician to administer and supervise testing at IDTFs. Id. at 11, 50. The Secretary's Medicare carrier conducted a study on the requisite qualifications for physicians at IDTFs with state medical specialist and accreditation authorities. Id. at 17. Those studies revealed the need for specific qualifications for supervising physicians at an IDTF. Id. Medicare carrier's group's study distinguished between a hospital and an IDTF in that the hospital has available consultants in multiple medical disciplines and IDTFs lack such resources. Id. In a well-reasoned report, the Medicare carrier's study concluded that physicians at the IDTF must be a radiologist or a physician possessing appropriate training on **all** tests administered at an IDTF, as approved by the Medicare carrier. Id.

The Defendant MedQuest, a multistate firm with IDTFs in thirteen states, had chief officers who were well experienced with the Medicare regulations for IDTFs. Contrary to the Defendants' argument, the Defendants' Medicare carrier actually approved as a supervisory physician for MedQuest's Nashville area IDTFs, a physician who received appropriate training on testings at an IDTF and who was not a radiologist. Thereafter, despite this approval, the Defendants consistently ignored the Secretary's designee's express requirements to satisfy Medicare's statutory mandate of "demonstrated capability". The Defendants effectively set aside this statutory mandate. The extent of the Defendants' disregard of these Medicare regulations is reflected in the proof that MedQuest's Nashville area IDTFs managers had constant problems

12

securing any physicians for testing at those facilities and that non-physicians actually administered these contrast tests without **any** physician supervision. Such disregard constitutes a serious violation of Medicare law.

To be sure, Defendants presented expert testimony that any physician could supervise contrast testing, but this proof cannot set aside Medicare's statutory mandate and Congress' designation of the Secretary to regulate the implementation of this statutory mandate. Moreover, the Secretary was never informed of most of the physicians at MedQuest's Nashville IDTFs who were supervising contrast studies. Whatever these physicians' qualifications, under Medicare regulation, these physicians had to be approved by Medicare. The Defendants' widespread use of physicians who were not approved by Medicare, compromises Congress's mandate and Medicare's mandatory regulations.

As to the change of ownership, Medicare regulations clearly consider a change of ownership of an IDTF a significant event, as reflected by Secretary's regulation, 42 C. F.R.§ 410.33(g)(2), mandating notice of such a change within 30 days. The significance of the Charlotte Center's change of ownership is underscored here by Dr. Witt's erratic availability for supervision at MedQuest's Nashville area IDTFs. After Dr. Witt sold the Charlotte facility, MedQuest controlled that facility's operations and Dr. Witt considered that sale to end his physician practice. To be sure, Dr. Witt had supervisory duties under his contract with MedQuest, but those duties were undermined by his actual unavailability that led to MedQuest's termination of Dr. Witt. MedQuest's managers at its Nashville area IDTFs, including the Charlotte facility, were consistently unable to secure sufficient physicians for supervision of testing. As the Court noted in its prior Memorandum, among the primary purposes of Medicare is providing the best quality care. (Docket Entry No. 218, Memorandum at 69). MedQuest's

lack of notification of the ownership change at the Charlotte facility for 18 months is a serious violation as that IDTF conducted testing and billed Medicare for 18 months without any knowledge by Medicare of who were providing contrast studies of Medicare beneficiaries for which Medicare was paying.

As to statistical disparity between actual damages and statutory penalties, Courts' awards of treble damages and civil penalties include higher ratios of damages and civil penalties in FCA actions than here. See Mayers, 806 F.2d at 999 (award of $24,697.73 in damages and $1,791,100 in civil penalties for an approximate ratio of 44 to1); United States v. Byrd, 100 F.Supp.2d at 344-45(ratio of 15.5:1) Mackby, 339 F.3d at 1018 (the ratio of single damages $58,151.64 to civil penalties of $550,000 for approximate ratio of 9 to1); United States v. Diamond, 657 F. Supp. 1204, 1206 (S.D.N.Y 1987) (144.07 to1). Some Courts have awarded lower ratios. United States ex rel. Smith v. Gilbert Realty, 840 F. Supp. 71, 75 (E.D. Mich. 1993) (7 to 1); Tyson, 488 F.Supp.2d at 745-48 (ratio of approximately 6 to 1); United States v. Williams, 2003 WL 21384640 at *6 (N.D. Ill. June 12, 3003) (ratio of approximately 5 to 1). See also Cooley v. Lincoln Elec. Co., 776 F.Supp.2d 511, 551-55 (N.D. Ohio, 2011) (the district court assessed punitive damages and compensatory damages in a ratio of 6 to 1 in a non FCA action). The ratio of this Court's award of damages to civil penalties is approximately 8 to 1 that is within the range of FCA awards by other Courts.

### b. The possible maximum penalty available under the FCA

Here, the civil penalties were not awarded for all tests administered at the Defendants Nashville area IDTFs. The Government sought civil penalties only for contrast testing without approved physician supervision and for contrast testing at MedQuest's unapproved IDTF, the Charlotte facility. The Court awards penalties only for Medicare paid claims that lacked

approved physician supervision of contrast testing at MedQuest's Nashville area IDTFs and such testings at MedQuest's Charlotte IDTF that Medicare had not approved. Under Medicare regulations, IDTFs administer various diagnostic testing with and without physician supervision, but requires physician supervision contrast testing. 42 C.R.F. § 410.33(b)(2).

Medicare requires that the IDTF's supervising physician possess training for "each type of diagnostic procedure performed by the IDTF." Id. The Defendants' IDTFs provided tests in addition to contrast testing for which there were not any Medicare approved physicians at these facilities. The Charlotte facility was not qualified by Medicare to perform any testing of Medicare beneficiaries. Thus, the award of the civil penalties here does not address the full extent of the Defendants' actual testing without Medicare approved physicians or testing at an IDTF that Medicare did not approve, the Charlotte facility.

Moreover, "civil penalty awards in which the amount of the award is less than the statutory maximum do not run afoul of the Excessive Fines Clause." United States v. Mackby (Mackby II), 221 F.Supp.2d at 1106, 1110 (W.D. Cal. 2002) (and cases cited therein); Ghaith R. Pharaon v. Board of Governors of Fed. Reserve Sys., 135 F.3d 148, 156 (D.C.Cir.1998) (holding that a $37 million penalty did not violate the Excessive Fines Clause since "the penalty [was] proportional to [the] violation and well below the statutory maximum [of $111.5 million]"); United States v. Emerson, 107 F.3d 77, 79 (1st Cir.1997) (holding that "a fine one-half the size of that permitted by the relevant statute, assessing $5,000 for each of [defendant's] thirty-seven admitted violations rather than the statutory maximum of $10,000 per violation ... though substantial, is constitutionally permissible."). See also United States v. Eghbal, 475 F.Supp.2d 1008 (C.D.Cal. 2007). Here, although the statutory maximum civil penalty of $11,000 was imposed for the Defendants' first FCA violation, that civil penalty was

15

not imposed on all tests conducted by the Defendants' IDTFs that operated without Medicare approved physicians. Thus, the statutory maximum for civil penalties was not imposed. Moreover, the $5,500 civil penalty is the statutory minimum for the Defendants' second FCA violation.

As to awards of penalties in comparable actions, see <u>United States ex rel. Bander v. Gambro Healthcare U.S.</u>, 4:01-cv-00553-DDN, (Order approving $366.5 million settlement for use of a shell-company supplier for Medicare payments) and <u>United States v. Gambro Supply Corp.</u>, 4:04-cr-00660, Docket Entry No. 2, Information and Docket Entry No. 7, Plea Agreement (plea agreement with an agreed $25,000,000 criminal fine for a Medicare violation). See also <u>United States ex rel. Williams v. Renal Care Group</u>, No. 3:09-00738, 2011 WL 2118231, at *9 (M.D. Tenn. May 26, 2011) (award of $82,642,592 for a multistate Medicare supplier's circumvention of an express Congressional mandate on eligible entities for higher prices for home dialysis equipment).

Here, the Court's civil penalty award is well below the statutory maximum given the Defendants' FCA violations.

### c. The class of persons for whom the statute was designed

Here, the applicable Medicare statute requires a health care provider to possess the "demonstrated capability" to provide Medicare services. 42 U.S.C. § 1395ddd(c)(1). This statute serves the interests of the United States and Medicare beneficiaries. The United States and Medicare beneficiaries were injured by the Defendants' FCA violations. The United States's injury is in the Defendants' compromise of the Medicare statute's "demonstrated capability" requirement, as well as violations of the Secretary's express Medicare regulations. The Medicare beneficiaries' injuries were as recipients of diagnostic testing without Medicare

approved physicians with appropriate training for an IDTF. In some instances, contrast testing was conducted without any physician supervision.

As the Court stated earlier "[i]t must be remembered that among the 'primary purposes of Medicare is to promote beneficiary access to high-quality medical care while preventing fraudulent suppliers from providing items or services to Medicare beneficiaries or billing the Medicare program or its beneficiaries.'" (Docket Entry No. 218, Memorandum at 69) (quoting Fayad v. Sebelius, No. 09-14119, 2011 WL 1120036 at *5 (E.D. Mich. March 25, 2011)(citing 71 Fed. Reg. 20754).

Applying the relevant factors on the proportionality analysis for the Defendants' Eighth Amendment challenge, the Court concludes that its award of treble damages and civil penalties in this action does not violate the Excessive Fines Clause of the Eighth Amendment.

As to the precedents cited by the Defendants, those authorities involved jury awards of punitive damages awards for single incidents violating state or federal laws. Exxon Shipping Co. v. Baker, 554 U.S. 471, 479-81 (2008) (Clean Water Act); Morgan v. New York Live Ins. Co., 559 F.3d 425, 432 (6th Cir. 2009) (Ohio civil rights law); Bridgeport Music, Inc. v. Justin Combs Pub., 507 F.3d 470, 475 (6th Cir. 2007) (federal copyright act); Bach v. First Union Nat'l Bank, 486 F.3d 150, 152 (6th Cir. 2007) (Fair Credit Reporting Act). Moreover, in State Farm Mutual Automobile Ins. Co. v. Campbell, 538 U.S. 408 (2003) also cited by the Defendants, the Supreme Court stated on due process grounds that "in practice, few awards **exceeding a single-digit ratio** between punitive and compensatory damages, to a significant degree, will satisfy due process." Id. 425 (emphasis added). Although the Defendants argue that based upon the amounts of the Court's awards, the ratio here is 10 to 1, in light of Cook County's recognition of treble

damages in a FCA as compensatory damages, the actual ratio of damages to civil penalties here is approximate 8 to 1 that satisfies the due process standard cited in State Farm.

Yet, the challenge here is under the Eighth Amendment. For the Eighth Amendment proportionality analysis, Courts distinguish between a jury award of punitive damages and statutory treble and civil penalty awards in FCA actions. In Cook County, the Supreme Court stated that "[t]reble damages certainly do not equate with classic punitive damages, which leave the jury with open ended discretion over the amount ..." 538 U.S. at 132. As the district court observed in Cuviello:

> In BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), the Supreme Court distinguished between punitive damages and civil penalties by holding that the factors to be considered when assessing the validity of a punitive damages award include the difference between punitive damages awarded by jury and civil penalties authorized or imposed in comparable cases.

2010 WL 3063199at * 6.

That court also recognized the distinction exists in United States ex rel. Rosales v. San Francisco Housing Authority, 173 F.Supp.2d 987 (N. D. Cal. 2001):

> **The Court has remarked elsewhere on the broad discretion traditionally accorded to juries in assessing the amount of punitive damages. Because evidence of a tortfeasor's wealth is traditionally admissible as a measure of the amount of punitive damages that should be awarded, the unlimited taxing power of a municipality may have a prejudicial impact on the jury, in effect encouraging it to impose a sizable award. The impact of such a windfall recovery is likely to be both unpredictable and, at times, substantial,** and we are sensitive to the possible strain on local treasuries and therefore on services available to the public at large.
>
> *Id.* at 270–71, 101 S.Ct. 2748 (citations and footnotes omitted). **However, the wealth of the defendant is not a factor to be taken into account by a jury under the FCA. Instead, penalties with fixed ranges and multipliers keyed to actual harm are mandated.** *See* 31 U.S.C. 3729(a) (providing for civil penalties plus "3 times the amount of *damages which the government sustains* because of the act.") (emphasis added). Thus "the broad discretion traditionally accorded to

juries in assessing the amount of punitive damages" is not at work under the FCA. The only discretion in an FCA award is in the hands of the judge who fixes the civil penalties within the $5,000–10,000 range. As it stands, the wealth of the SFHA will have no bearing on the calculation of damages should liability be established.

Id. at 1024 (emphasis in original and added).

Moreover, Baker that was decided under maritime common law, recognized exceptions to its holding on the ratio between compensatory damages and punitive damages. In Baker, the Court quoted its prior opinion, Gore, that "[a] higher ratio may also be justified in cases in which the injury is hard to detect." 554 U.S. at 494 (quoting Gore, 517 U.S. at 582). Other justifications are where Congress authorizes private litigation to supplement official enforcement. Id. at 494-95. Both exceptions are present here to allow, as constitutionally permissible, higher ratios of actual damages to punitive damages.

The legislative history of the FCA reflects Congress' concern that violations of the FCA are difficult to discern, thus warranting the mandatory treble damages and civil penalties.

> Detecting fraud is usually very difficult without the cooperation of individuals who are either close observers or otherwise involved in the fraudulent activity. Yet in the area of government fraud, there appears to be a great unwillingness to expose illegalities.

S. Rep. No. 345, 99th Cong., 2ND Sess. 1986, 1986 U.S.C.C.A.N 5266, 5269, 1986 WL 31937, S. REP. 99-345 (Leg.Hist.).

As to private enforcement of the FCA, the district court in United States ex rel. Rosales v. San Francisco Housing Authority, 173 F.Supp.2d 987 (N.D.Cal., 2001), quoted legislative history of the FCA that reveals Congressional findings on the necessity to authorize relators to file FCA actions "to halt the so called 'conspiracy of silence' that has allowed fraud against the government to flourish. John Phillips, co-director of the Center for Law in the Public Interest, a

nonprofit law firm specializing in assisting 'whistleblowers', testified that more effective fraud detection will only occur if changes are made at the basic employee level. Phillips said people who are unwilling participants in fraudulent activity must be given an opportunity to speak up and take action without fear and with some assurance their disclosures will lead to results. at 5271." Id. at 1020.

Thus, the Court deems the decisions cited by the Defendant to be distinguishable as a matter of law. The Court also concludes that the exceptions recognized in that line of decisions are applicable here to render the Court's awards of damages and civil penalties consistent with Eighth Amendment precedents.

Accordingly, the Court concludes that the Defendants' motion to reconsider (Docket Entry No. 227) should be denied, but based upon the parties' stipulation, the Court will modify the final award.

An appropriate Order is filed herewith.

ENTERED this the 21st day of October, 2011.

William J. Haynes, Jr.
United States District Judge